SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Lynn A. SMITH, Defendant.

Jill A. Dunn, Esq.; David M. Wojeski; Thomas J. Urbelis, Esq.; and James D. Featherstonhaugh, Esq., Non–Parties.

No. 10–CV–457 (GLS/DRH).

United States District Court, N.D. New York.

July 20, 2011.

**416**

David Stoelting, Esq., of Counsel: Kevin McGrath, Esq., Lara Shalov Mehreban, Esq., Haimavathi V. Marlier, Esq., Joshua Newville, Esq., New York, NY, for Plaintiff.

Featherstonhaugh, Wiley & Clyne, LLP, of Counsel: James D. Featherstonhaugh, Esq., Stephen B. Hanse, Esq., Scott J. Ely, Esq., Albany, NY, for Defendant Lynn A. Smith and Non–Party James D. Featherstonhaugh.

Steinberg & Cavaliere, LLP, of Counsel: Benjamin Zelermyer, Esq., White Plains, NY, for Non–Party Jill A. Dunn.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, of Counsel: Fred N. Knopf, Esq., White Plains, NY, for Non–Party David M. Wojeski.[1]

Carter, Conboy, Case, Blackmore, Maloney & Laird, P.C., of Counsel: Michael J. Murphy, Esq., Albany, NY, for Non–Party Thomas J. Urbelis.

Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, of Counsel: Thomas E. Peisch, Esq., Erin K. Higgins, Esq., Boston, MA, Attorney for Non–Party Thomas J. Urbelis.

### MEMORANDUM–DECISION AND ORDER

DAVID R. HOMER, United States Magistrate Judge.

Presently pending is the motion of plaintiff Securities and Exchange Commission ("SEC") for an order awarding sanctions against defendant Lynn A. Smith and non-parties Jill A. Dunn, Esq. ("Dunn"), David M. Wojeski ("Wojeski"), and Thomas J. Urbelis, Esq. ("Urbelis") as well as leave

1. David M. Wojeski was named as a defendant in this action in the amended complaint filed on August 2, 2010 in his capacity as Trustee of the David L. and Lynn A. Smith Irrevocable Trust U/A 8/04/04. Dkt. No. 100. As discussed *infra,* Wojeski thereafter resigned as Trustee and was replaced as a party in this case by the new Trustee in an order filed February 14, 2011. Dkt. No. 281.

to pursue discovery on the issue of sanctions as to non-party James D. Featherstonhaugh, Esq. ("Featherstonhaugh"). Dkt. No. 261. All such individuals oppose the motion. Dkt. Nos. 300–10. For the reasons which follow, the SEC's motion is granted in part and denied in part.

## I. Background

For a more complete description of the background of this action, see Mem.-Decision & Order filed May 9, 2011 Dkt. No. 321, 2011 WL 1770472 (district court's decision denying motions to dismiss of certain defendants); Mem.-Decision & Order filed Nov. 22, 2010 (Dkt. No. 194) ("MDO II"), 752 F.Supp.2d 220 at 222–23, 225–33; and Mem.-Decision & Order filed July 7, 2010 (Dkt. No. 86) ("MDO I"), 752 F.Supp.2d 194 at 199–204, 214–219; *see also* Mem.-Decision & Order filed Jan. 11, 2011 (Dkt. No. 254) ("MDO III") (denying the trust's motion for reconsideration of MDO II). As relevant to the pending motion, defendants Timothy M. McGinn ("McGinn") and David L. Smith formed McGinn, Smith & Co., Inc. ("MS & Co.") in 1981 with a principal place of business in Albany, New York. MDO I at 199. Through its own employees and through related entities, MS & Co. offered financial services to clients, including investment advice, stock brokerage services, and investments in securities which it sold. *Id.* Lynn Smith is married to David Smith. *Id.* In 2004, David and Lynn Smith created the David L. and Lynn A. Smith Irrevocable Trust U/A 8/04/04 ("Trust") for the benefit of the Smiths' two adult children. *Id.* at 199, 203–04. The SEC was created, *inter alia*, to regulate the purchases and sales of securities and acts to enforce compliance with laws and regulations governing such transactions. *See* 15 U.S.C. § 78a *et seq.*

On April 20, 2010, the SEC commenced this action by filing a complaint alleging that Timothy McGinn, David Smith, and their company defrauded investors of over $80 million through violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5 under the 1934 act, 17 C.F.R. § 240.10b–5; and related provisions. Compl. (Dkt. No. 1) at ¶¶ 7–12. To preserve defendants' assets for the benefit of investors in the event it prevails here, the SEC simultaneously sought and received a temporary restraining order ("TRO") (1) appointing a receiver to take possession of defendants' assets and of MS & Co. and its related entities, (2) freezing defendants' assets pending the outcome of this action, (3) freezing the assets of Lynn Smith, (4) ordering verified accountings, and (5) granting related relief. Dkt. Nos. 4, 5. A receiver was appointed and the assets of the defendants and Lynn Smith were frozen pending a hearing. TRO at 7. Among the assets frozen was the Trust. *Id.*

In the early 1990s, David and Lynn Smith purchased 40,000 shares of stock at the initial offering of an Albany-area bank for $400,000. MDO I at 203–04. By August 2004, through bank mergers and acquisitions, the number of shares had increased to approximately 100,000 and their value to over $4 million. *Id.* at 203–04. With that stock, David and Lynn Smith created the Trust for the benefit of their two children, now ages thirty-one and twenty-eight. *Id.* at 204. Urbelis was selected by the Smiths as Trustee of the Trust and remained in that position until his resignation on April 22, 2010. Urbelis Dep. Tr. (Dkt. No. 66–1) at 10–11, 49–51; T. 312–13, 320, 323, 388–89.[2] Urbelis had

---

**2.** "T." followed by a number refers to the page of the transcript of the evidentiary hearing on the SEC's motion for a preliminary injunction held June 9–11, 2010. Dkt. Nos.

remained friends with the Smiths since childhood and the families spent significant time together each year. Urbelis Dep. Tr. at 7–10; T. 313, 389, 507, 566. Urbelis was employed as a lawyer in Boston specializing in real estate and municipal law. *Id.* at 5–6; T. 313.

After Urbelis resigned as Trustee on April 22, 2010, Wojeski was appointed as the new Trustee at the behest of Dunn, the Trust's attorney. Wojeski Aff. (Dkt. No. 306) at ¶ 3. Following entry of the TRO, the Trust moved to intervene and for an order lifting the TRO as to the Trust. Dkt. No. 39. An evidentiary hearing on that motion was held on June 9–11, 2011 at which the Trust contended that, contrary to the contentions of the SEC, David Smith held no interest in the Trust after its creation in 2004. MDO I at 218–19. Finding that David and Lynn Smith had created an irrevocable trust in which they held no interest of any kind after its creation in 2004, the Court denied the SEC's motion for a preliminary injunction as to the Trust, the Trust's motion to unfreeze the Trust from the TRO was granted, and control of the Trust's assets was returned to the Trust. *Id.* at 217–19, 219–20. Central to this finding was the absence of any evidence that David Smith held any present or future interest in the Trust. *Id.* at 217–19. In the next two weeks, the Trust disbursed over $1 million of its approximately $4 million in assets for attorneys' fees and other expenses more fully described *infra.* MDO II at 222.

Two weeks later, the SEC discovered that notwithstanding the purported irrevocable character of the Trust, the Smiths and Urbelis as Trustee entered into a second agreement effective August 31, 2004 entitled "Private Annuity Contract Between David L. Smith & Lynn A. Smith as Transferors and the David L. & Lynn A. Smith Irrevocable Trust U/A dated August 31, 2004, Transferee." Dkt. No. 103–3 ("Annuity Agreement"). The Annuity Agreement required the Trust to make annual payments from the Trust to the Smiths of $489,932.00 beginning September 26, 2015 and continuing until the last of David or Lynn Smith died or the annuity was exhausted. *Id.* When the payments commenced in 2015, the Smiths would be ages 69 and 70 with the longest life expectancy of either being fifteen years. Dkt. No. 103–4. Assuming no other distributions from the Trust, the distributions under the Annuity Agreement would exhaust the Trust's assets with the fifteenth and final payment to the Smiths. *Id.* If the Trust assets were not exhausted before the last of the Smiths died, the remaining assets would remain with the Trust for the benefit of the Smiths' children. Dkt. No. 103–3.

The Annuity Agreement constituted conclusive evidence of David Smith's ongoing interest in the Trust, the issue central to the determination of the SEC's motion for a preliminary injunction as to the Trust and the Trust's cross-motion to lift the TRO. *See* MDO I, MDO II. Prior to and at the June evidentiary hearing, the SEC sought discovery of all documents related to the Trust and of any interest the Smiths retained in the Trust. MDO II at 228–31; Stoelting Decl. (Dkt. No. 103–2) at ¶¶ 9–34. Lynn Smith filed a required financial disclosure statement omitting any reference to an interest in the Trust and testified at a deposition and at the evidentiary hearing that she retained no interest in the Trust.[3]

---

87–89. The transcripts of that hearing mistakenly indicate that it was held on July 9–11, 2010.

3. David Smith asserted his Fifth Amendment privilege against self-incrimination in declining to provide a sworn financial statement but filed a list of assets which omitted any refer-

Dkt. No. 19 (Lynn Smith financial statement); Stoelting Decl. (Dkt. No. 103-2) at ¶¶ 12-14 (Lynn Smith response to SEC's document demand); (Lynn Smith Aff. filed 5/26/10) (Dkt. No. 34) at ¶ 6 ("From the time the trust was created in August 2004, my husband and I have had no interest in or expectation of an interest in the ... Trust. It exists solely, exclusively and permanently for the benefit of our children."); Lynn Smith Dep. Tr.(Dkt. No. 46-3) at 39-41, 79-87; T. 303-11, 320, 388, 391-92. Lynn Smith's explanation for her failure to disclose the Annuity Agreement was that she had simply forgotten about it. Lynn Smith Aff. filed Mar. 21, 2011 (Dkt. No. 303-1) at ¶ 5 ("To this day, I do not recall signing the annuity agreement, although it is clearly my signature on the agreement, and until it was produced in late July 2010 and explained to me by Mr. Featherstonhaugh, I did not recall that this agreement even existed or that I had a future interest in the Trust in the form of annuity payments beginning in 2015.").[4]

Since the decision on July 7, 2010 removing the Trust from the TRO, three copies of the Annuity Agreement have surfaced—one from Urbelis, a second from David Smith, and a third from law enforcement authorities.[5] Urbelis, had maintained a copy of the Annuity Agreement at his home separately from his other records regarding the Trust which he kept at his office. Urbelis Aff. (Dkt. No. 309) at ¶¶ 10, 11. Urbelis resigned as Trustee of the Trust on April 22, 2010, two days after the commencement of this action and the execution of the search warrants. *Id.* at ¶ 15. Urbelis, who resides in Boston, Massachusetts, was thereafter contacted by the SEC and, on short notice, agreed to provide the SEC with what documents he could locate regarding the Trust, did so, and then voluntarily traveled to Albany to testify at a deposition concerning these matters.[6] *Id.* at ¶¶ 19-32. Urbelis did not include the Annuity Agreement in his disclosures. *Id.* at ¶ 11, 41, 42, 44. The SEC contacted Urbelis again on July 23, 2010 as a result of which Urbelis searched his home as well as his office for additional Trust documents, located the Annuity Agreement at his home, and provided copies to the SEC and Dunn. *Id.* at ¶¶ 40-44.

Prior to and at the June evidentiary hearing, Wojeski testified and Dunn argued that the Smiths had no ongoing interest in the Trust. MDO I was filed on July 7, 2010 denying the SEC's motion for a preliminary injunction as to the Trust and releasing the Trust's assets from the asset

---

ence to the Annuity Agreement or the Trust. Dkt. No. 17, 22.

**4.** The Smiths had listed the Trust as one of their assets in financial statements in 2008. *See* Dkt. No. 46-4 at 14-22, Lynn Smith could not recall why the Trust had been included. Lynn Smith Dep. Tr. at 79-87; T. 303-11. David Smith had also referred to a "private annuity trust" in a letter in 2004, but prior to July 22, 2010, this reference was taken by all as referring to the Declaration of Trust rather than the Annuity Agreement. *See* MDO II at 228-29.

**5.** On April 20, 2010, criminal law enforcement authorities executed a series of search warrants in connection with the matters alleged in the SEC's complaint herein. *See* MDO I at 201 n. 10. One of the premises searched was the Smiths' residence from which law enforcement officials seized a copy of the Annuity Agreement. Transcript of Stoelting Testimony at Nov. 16, 2011 Hrg. (Dkt. No. 212) at 42-46. While those officials provided certain documents which they seized to the SEC for its use in this case, it appears that a copy of the Annuity Agreement was not provided by them to the SEC until late October 2010. *Id.* at 46.

**6.** The SEC electronically mailed a subpoena to Urbelis after his agreement to produce documents and testify at the deposition. Urbelis Aff. at ¶ 22.

freeze. On July 20, 2010, Wojeski received a telefax from David Smith which included the Annuity Agreement. Wojeski Decl. filed Nov. 17, 2010 (Dkt. No. 191) at ¶ 3. Wojeski forwarded the same documents to Dunn electronically on July 21, 2010. Dunn Decl. filed Nov. 15, 2010 (Dkt. No. 188) at ¶ 3. On July 22, 2010, Dunn was telephoned by two SEC attorneys during which she made a passing reference to the Annuity Agreement. MDO II at 225–28. This reference caused the SEC to contact Urbelis again which led to production of the Annuity Agreement to the SEC on July 27, 2010 and by the SEC to Dunn shortly thereafter. *Id.* Notwithstanding the electronic mails on July 20 and 21, 2010, Wojeski and Smith filed declarations with the Court in September and October, 2010 falsely asserting that they both first learned of the existence of the Annuity Agreement when it was produced to them by the SEC on July 27, 2010. Dunn Decl. filed Sept. 3, 2010 (Dkt. No. 134) at ¶¶ 24–36; Wojeski Decl. filed Oct. 7, 2010 (Dkt. No. 147) at ¶ 2. Both corrected these statements on the eve of and immediately after the evidentiary hearing on November 16, 2010. Dunn Decl. filed Nov. 15, 2010 (Dkt. No. 188); Wojeski Decl. filed Nov. 17, 2010 (Dkt. No. 191).

By July 28, 2010, it had become clear that a document existed which demonstrated the central fact at issue in the SEC's motion for a preliminary injunction as to the Trust—that David Smith possessed a continuing interest in the Trust by virtue of the Annuity Agreement. It had further become clear that the individuals who had signed the Annuity Agreement and others associated with the Trust had failed to disclose the existence of the Annuity Agreement despite obligations to do so or

asserted contentions directly refuted by that agreement. The SEC's discovery of the Annuity Agreement caused it on August 3, 2010 to seek reconsideration of the order denying a preliminary injunction as to the Trust, that motion was granted, and upon reconsideration, the SEC's motion for a preliminary injunction as to the Trust was granted and its assets again frozen pending the outcome of this litigation. Dkt. Nos. 103, 104; MDO II. Before the Trust's assets were again frozen on August 3, 2010, it disbursed over $1 million as more fully described *infra.* This motion followed.

## II. Discussion

### A. Legal Standards

The SEC seeks sanctions pursuant to Fed.R.Civ.P. 11, 28 U.S.C. § 1927, and the inherent power of the Court.[7] Rule 11 imposes a duty on attorneys reasonably to assure that assertions and arguments in papers submitted to a court are supported by evidence. Fed.R.Civ.P. 11(b). Violation of this duty may lead to the imposition of sanctions. Fed.R.Civ.P. 11(c). The rule provides two procedures to raise the issue of sanctions and, in the Second Circuit, the two procedures carry different standards of proof. *See ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 579 F.3d 143, 150–52 (2d Cir.2009); *In re Pennie & Edmonds LLP,* 323 F.3d 86, 88–93 (2d Cir.2003). Under Rule 11(c)(2), a party may move for sanctions for a violation of Rule 11, the offending party has a twenty-one day "safe harbor" to correct the alleged error, and, if not corrected, sanctions may be imposed if it is shown that the attorney acted with objective unreasonableness. *ATSI Communications,* 579 F.3d at 150. Under Rule 11(c)(3), a court

---

**7.** The SEC does not seek sanctions under Fed.R.Civ.P. 37 and, accordingly, those provisions will not be addressed.

*sua sponte* may initiate sanctions proceedings, for which no "safe harbor" is afforded but which requires a finding of subjective bad faith. *Id.; Pennie,* 323 F.3d at 90 (reasoning that in the absence of a "safe harbor" provision, a sanctions proceeding is more akin to a contempt proceeding and the higher standard of proof should apply).

The SEC asserts that because this Court "invited" the present motion, Rule 11(c)(3) applies obviating the availability of a "safe harbor" but implicating the higher standard of proof. Pl. Mem. of Law (Dkt. No. 361–1) at 17; *see also* MDO II at 233 (granting the SEC leave to move for sanctions without the necessity of the premotion conference required by N.D.N.Y.L.R. 7.1(b)(2)). In these circumstances, the SEC's motion will be considered under Rule 11(c)(3) implicating the higher standard of proof.

■ Section 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Thus, § 1927 authorizes sanctions "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose," and upon "a finding of conduct constituting or akin to bad faith." *60 E. 80th St. Equities, Inc. v. Sapir (In re 60 E. 80th St. Equities, Inc.),* 218 F.3d 109, 115 (2d Cir.2000) (internal quotation marks omitted). This section requires proof of bad faith. *Gollomp v. Spitzer,* 568 F.3d 355, 368 (2d Cir.2009). The procedural requirements include notice and an opportunity to be heard. *Id.* (requiring notification of "(1) the source of authority for the sanctions being consid-

ered; and (2) the specific conduct or omission for which the sanctions are being considered," but stating that, depending on the circumstances, "a full evidentiary hearing is not required[, and] the opportunity to respond by brief or oral argument may suffice" (internal quotation marks and citation omitted)).

■ Finally, the SEC invokes the inherent power of the Court to impose sanctions for conduct undertaken in bad faith. Courts possess the inherent authority to sanction parties and their attorneys for conduct undertaken in bad faith. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 42–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). That authority follows from the need of courts "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43, 111 S.Ct. 2123; *see also Zlotnick v. Hubbard,* 572 F.Supp.2d 258, 272 (N.D.N.Y.2008) (Sharpe, J.). Sanctions may be considered under this authority when a party or attorney acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 136 (2d Cir.1998) (quoting *Chambers,* 501 U.S. at 45, 111 S.Ct. 2123). A court "must find bad faith in order to impose such sanctions and bad faith must be shown by clear evidence" that the actions in question are taken for "harassment or delay or ... other improper purposes." *United States v. Int'l Bhd. of Teamsters,* 948 F.2d 1338, 1345 (2d Cir. 1991) (internal citations and quotation marks omitted).

■ "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers,* 501 U.S. at 50, 111 S.Ct. 2123; *see also DLC Mgmt. Corp.,* 163 F.3d at 136; *Int'l Bd. of Teamsters,* 948 F.2d at

1345 ("Because of the potency of the court's inherent power, courts must take pains to exercise restraint and discretion when wielding it. Accordingly, this court has required a finding of bad faith for the imposition of sanctions under the inherent power doctrine."); *LeGrande v. Adecco*, 233 F.R.D. 253, 257–58 (N.D.N.Y.2005) (holding that when a court considers imposing sanctions, it should do so with restraint and only when a party acts in bad faith, vexatiously, wantonly or for oppressive reasons). To impose sanctions under the Court's inherent authority, then, there must exist clear and convincing evidence that an individual's conduct was not merely negligent but was undertaken with subjective bad faith. *See Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 338 (2d Cir.1999); *Podany v. Stephens*, 318 F.Supp.2d 146, 154 (S.D.N.Y.2004) (noting that as in any inquiry into a person's state of mind, consideration must be given to circumstantial evidence and not simply to the objective truthfulness of the statements in question).[8]

8. Dunn argues that the jurisdiction of a magistrate judge to decide this motion rests on the consent of all parties under 28 U.S.C. § 636(c), she is a party to this motion since sanctions are sought against her, she has not consented to the jurisdiction of a magistrate judge, and the undersigned therefore lacks jurisdiction to decide this motion. Dunn Mem. of Law (Dkt. No. 300) at 7. First, however, the actual parties to this action previously consented to the jurisdiction of a magistrate judge for any and all proceedings and enter a final order as to" the SEC's motion for a preliminary injunction. Dkt. Nos. 12 (consents for David Smith, Timothy McGinn, and Lynn Smith), 59 (consent signed by Dunn as counsel for the Trust). The parties to the action at the time of the motion at issue thus consented to the jurisdiction of a magistrate judge as required by § 636(c). Second, the SEC's motion for sanctions here is ancillary to its motion for a preliminary injunction and thus within the scope of "any and all proceedings" concerning the preliminary injunction motion to which the parties consented. The separate and independent consent of the parties' attorneys is not required by § 636(c). Third, the SEC's motion for sanctions here is non-dispositive under § 636(b) and Fed. R.Civ.P. 72 and, therefore, no consent is required. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116–17 (2d Cir.2010) (upholding district court's determination that the motion to quash or sever was non-dispositive and thus properly determined by a magistrate judge); *see also Kiobel v. Millson*, 592 F.3d 78, 79 (2d Cir.2010) (declining to determine whether a magistrate judge possesses independent authority to impose sanctions under Rule 11). Finally, even if the SEC's motion here is deemed dispositive and additional consent is required for a magistrate judge to determine the SEC's motion for sanctions, which has not been required here, this decision may be deemed a report-recommendation under § 636(b) and reviewed *de novo* by the district court or the court of appeals. *See Kiobel*, 592 F.3d at 79.

## B. Merits of the SEC's Motion

### 1. Lynn Smith

Prior to the Court's decision in MDO I on July 7, 2010, Lynn Smith filed three sworn statements with the Court and testified at a deposition and the evidentiary hearing. Dkt. Nos. 19 (Statement of Assets), 23 (affidavit), 34 (affidavit), 46–3 (transcript of deposition), 88 (transcript of testimony at evidentiary hearing). In those documents and testimony, Lynn Smith failed to disclose the fact that she and David Smith were entitled to receive almost $500,000 annually from the Trust beginning in 2015 until both David and Lynn Smith died or the Trust was exhausted of assets, falsely asserted that the Trust was created by she and David Smith solely for the benefit of their children, and falsely denied that she and David Smith had any ongoing interest in the Trust. As previously described,

> ... Lynn Smith was required to file a verified financial statement, which she did on May 5, 2010. That statement

contained no reference to the Annuity Agreement. Dkt. No. 19.... On May 10, 2010, the SEC served Lynn Smith with a request to produce documents. Dkt. No. 103–5. Requests 9–11 and 17 all required Lynn Smith to produce the Annuity Agreement, but she did not. *Id.* at 5–6;6 Stoelting Decl. at ¶¶ 13, 14. In an affidavit filed May 21, 2010, Lynn Smith stated that "[f]rom the time the trust was created in August 2004, my husband and I have had no interest in *or expectation of an interest* in the ... Trust. *It exists solely, exclusively and permanently for the benefit of our children.*" Dkt. No. 34 at ¶ 6 (emphasis added). In a deposition by the SEC on May 27, 2010, Lynn Smith was asked numerous questions which reasonably should have elicited disclosure of the Annuity Agreement, but she again failed to disclose its existence. Dkt. No. 46–3 at 39–41, 46, 79–87.[9] Lynn Smith also testified at the hearing on the SEC's motion for a preliminary injunction on June 10, 2010. Lynn Smith again failed to disclose the existence of the Annuity Agreement despite numerous questions for which disclosure would reasonably have been required. Dkt. No. 88 at 320, 388, 391–93.[10]

MDO II at 224 (footnotes omitted).

Under the inherent power doctrine, the record establishes beyond question that Lynn Smith possessed actual knowledge of the Annuity Agreement as one of its signatories, the existence of that agreement was a material fact in the determination of the SEC's motion for a preliminary injunction as to the trust, Lynn Smith failed to disclose the existence of the Annuity Agreement on multiple occasions before July 7, 2010 and denied that she and David Smith had any continuing interest in the Trust, and these false statements and omissions materially contributed to the finding in MDO I that David and Lynn Smith lacked any equitable, beneficial, or ongoing interest in the Trust. Similarly, under Rule 11(b), Lynn Smith omitted disclosure of the annuity Agreement and of the ongoing interest of herself and David Smith in the Trust and falsely asserted that the Trust was created solely for the benefit of her children in sworn documents which she submitted to the Court. *See* Dkt. Nos. 19, 23, 34.[11] This conduct in turn led to the

---

9. For example, Lynn Smith testified at her deposition as follows:

Q: So, the trust was created, you would agree, for your children not for you and your husband?

A: Exactly.

Dkt. No. 46–3 at 40.

10. For example, Lynn Smith testified at the evidentiary hearing as follows:

Q: Did you believe any time after September 1, 2004, when you transferred this stock, at any time did you believe that the money in that irrevocable trust account was yours?

A: No.

...

Q: Did you ever contact Tom Urbelis and ask him for money?

A: No.

T. 392

11. Lynn Smith correctly notes that Rule 11 sanctions are limited to documents filed with the Court. l. Smith Mem. of Law (Dkt. No. 303) at 7; *see also Davidson v. Desai,* No. 03–CV–121S(F), 2006 WL 3536176, at *3 (W.D.N.Y. Dec. 7, 2006); *Paese v. New York Seven–Up Bottling Co., Inc.,* 158 F.R.D. 34, 37 (S.D.N.Y.1994). Lynn Smith filed a verified Statement of Assets on May 5, 2010 (Dkt. No. 19) as directed by an order filed April 20, 2010 (Dkt. No. 5 at 9). This Statement omitted any reference to the Annuity Agreement. Lynn Smith filed an affidavit on May 26, 2010 in support of the Trust's motion to intervene in this action and to unfreeze the Trust's assets. Dkt. No. 34. Therein, Lynn Smith asserted that the Trust existed "solely, exclusively and permanently for the benefit of the children." *Id.* at ¶ 6. That affidavit also failed to disclose the existence of the Annuity Agreement.

release and return of the Trust's assets to the substantial benefit of Lynn Smith.

■ Under the inherent power doctrine and Rule 11(c)(3), then, the question presented is whether the SEC has demonstrated by clear and convincing evidence that Lynn Smith acted in this regard with subjective bad faith. *See ATSI Communications, Inc.*, 579 F.3d at 150 (holding that where a court initiates sanctions proceedings after the opportunity to correct a submission has passed, subjective bad faith must be shown as in proceedings for contempt). Subjective bad faith requires proof of deliberate fraud or wrongdoing. *See Amlong & Amlong, P.A. v. Denny's, Inc.*, 457 F.3d 1180, 1190 (11th Cir.2006); *see also United States v. Pangburn*, 983 F.2d 449, 454 (2d Cir.1993) (describing subjective bad faith as "intentional or deliberate misconduct").

Here, the central issue on the SEC's motion for a preliminary injunction as to the Trust was whether David and Lynn Smith possessed any interest in the Trust—equitable, beneficial, present, future, or otherwise. *See* MDO I at 217–19. The Annuity Agreement demonstrated their ongoing interest. *See* MDO II at 231–33.[12] As one of three signatories, Lynn Smith was one of three people with knowledge of the existence of the Agreement prior to July 7, 2010. Her concealment of the agreement's existence was critical to obtaining the release of the Trust from the asset freeze then in place. Within days of the July 7, 2010 decision unfreezing the Trust, the Trust expended approximately $1 million, most to the benefit of Lynn Smith.

■ Against this overwhelming evidence of deliberate concealment and misrepresentation, Lynn Smith contends that she in fact simply forgot the existence of the Annuity Agreement. L. Smith Aff. (Dkt. No. 303–1) at ¶ 5. In support of this assertion, Lynn Smith correctly notes that her written statements and testimony prior to July 22, 2010 were consistent in their denials of any ongoing interest in the Trust, she had signed the document almost six years earlier, and she was forced to rely solely on her memory at the time as law enforcement authorities had seized her and David Smith's records. L. Smith Mem. of Law (Dkt. No. 303) at 13–17.[13] For at least three reasons, however, Lynn Smith's contention of forgetfulness remains unpersuasive. First, as discussed *supra*, the Annuity Agreement conclusively refuted the Trust's claim that David and Lynn Smith lacked any interest in the Trust. Because disclosure of the Annuity Agreement would effectively derail the Trust's effort to remove the Trust from the asset freeze, Lynn Smith possessed strong motive to conceal the existence of that agreement.[14]

12. With the Annuity Agreement, then, the SEC has demonstrated a substantial likelihood of success that it will prove that David and Lynn Smith created the Trust and the Annuity Agreement together to avoid gift and capital gains taxes approaching 50% of the $4.5 million value of the Trust assets, that David Smith maintained control of the investment of Trust assets after the Trust was created, and that he and his wife paid Trust taxes and the living expenses of a Trust beneficiary to insure that the annuity payments required by the Annuity Agreement could be made beginning in 2015. Therefore, the SEC has satisfied its burden of showing a substantial likelihood of success as to the Trust....

MDO II at 232–33.

13. *See* note 5 *supra*.

14. Lynn Smith contends that discovery of the Annuity Agreement came as welcome news to her, not as a problem. She states that disclosure of the agreement in July 2010 meant to her that she now had a contractual claim to nearly $500,000 annually beginning in 2015 about which she was previously unaware. L. Smith Aff. (Dkt. No. 303–1) at ¶ 11. There-

Second, the amount of the annual and total payments required to be made to the Smiths by the Trust in combination with the manner in which the Smiths and their children acted to preserve the Trust's assets from the time of its creation serve to refute Lynn Smith's assertion of forgetfulness. The contractual right to receive nearly $500,000 annually beginning in 2015 constitutes an inordinately large amount for anyone, including Lynn Smith, and would reasonably constitute a principal element of retirement planning. Both David and Lynn Smith took unusual steps to preserve the Trust's assets from its creation in 2004 until it was frozen in 2010. David Smith paid approximately $100,000 in taxes on behalf of the Trust without seeking reimbursement from the Trust even though the Trust was responsible for its own taxes and possessed sufficient assets to pay them. MDO II at 231–32. Lynn Smith paid her daughter's bills for one year even though it appears that such expenses were precisely the type for which the Trust was supposedly created. *Id.* at 232. In fact, until 2010, neither of the Smiths' children, the supposed beneficiaries of the Trust, ever sought or received a single distribution from the Trust. MDO I at 203–04. Thus, both the amount of the payments required under the Annuity Agreement and the Smiths' unusual efforts to preserve the Trust's assets undermine Lynn Smith's claim of forgetfulness.

Third, Lynn Smith's testimony and contentions here have been consistently self-serving, contradicted by other evidence, and unworthy of belief unless corroborated by compelling independent evidence. *See, e.g.,* MDO I at 202 n. 13 (finding incredible Lynn Smith's testimony that the transfer of assets held jointly with her husband throughout their forty-two year marriage into her name alone in 2009 was unrelated to any attempt to shield assets from disgruntled investors and regulatory authorities). Therefore, in the face of the compelling evidence that Lynn Smith deliberately concealed the Annuity Agreement and misrepresented her and David Smith's ongoing interest in the Trust, her assertion that she simply forgot the existence of that agreement cannot be accepted. By clear and convincing evidence, then, the SEC has demonstrated that Lynn Smith's failure to disclose the Annuity Agreement prior to July 7, 2010 and her false claim that neither she nor David Smith possessed any ongoing interest in the Trust were done in subjective bad faith in violation of Rule 11(c)(3) as to the affidavits filed by Lynn Smith and, as to all such conduct, within the scope of the Court's inherent power to sanction such conduct.

Lynn Smith raises a procedural objection to the SEC's motion under Rule 11. She contends that since this proceeding was initiated by the motion of the SEC rather than by an order to show cause from the Court, the provisions of Rule 11(c)(2) govern.[15] L. Smith Mem. of Law

---

fore, she was motivated to find and disclose the Annuity Agreement, not to conceal it. *Id.* The credibility of this assertion depends, however, on the likelihood that the Trust's assets would be unavailable. If the Trust's assets would not likely be available for payments beginning in 2015, then Lynn Smith had no motive to discover and disclose the Annuity Agreement and every motive to conceal it to obtain a lifting of the asset freeze. David Smith conceded on the SEC's preliminary injunction motion that the SEC was likely to

prevail on the merits of its claims. *See* MDO I at 213–14. Given this stipulation, it appears unlikely that the Trust's assets will be available in 2015 to satisfy its obligations to David and Lynn Smith beginning in 2015 and Lynn Smith's claim that discovery of the Annuity Agreement in July 2010 was actually welcome news must be rejected.

**15.** Rule 11(c)(2) provides in pertinent part that "[a] motion for sanctions must be made separately from any other motion and must

(Dkt. No. 303) at 5–7. She contends that Rule 11(c)(2) affords her a twenty-one day "safe harbor" after service of the motion within which to correct any alleged false statement before the motion for sanctions is filed and, since the SEC's motion was filed without allowing for the "safe harbor," sanctions under Rule 11(c)(2) must be denied. *Id.* It appears from the record that the SEC did in fact fail to comply with the notice and safe harbor provisions of Rule 11(c)(2) and, therefore, the SEC's motion under Rule 11(c)(2) as to Lynn Smith's submission of the Statement of Assets (Dkt. No. 19) and her affidavit (Dkt. No. 34) must be denied. *See Bryant v. Britt,* 420 F.3d 161, 163 & n. 2 (2d Cir.2005) (affirming denial of motion for sanctions under Rule 11 for failure to comply with notice and safe harbor provisions).

As discussed above, however, the SEC has demonstrated by clear and convincing evidence that Lynn Smith acted with subjective bad faith in failing to disclose the existence of the Annuity Agreement in the Statement of Assets (Dkt. No. 19), her affidavit (Dkt. No. 34), and in her testimony at her deposition and at the evidentiary hearing. The consequences of that conduct included the depletion of the Trust's assets by nearly $1 million, the unnecessary expenditure of court resources on the SEC's motion for reconsideration after discovery of the Annuity Agreement, and the expenditure of resources and costs by the SEC on the same motion. Having demonstrated Lynn Smith's subjective bad faith in these regards, the SEC has met its burden of proof under both Rule 11(c)(3) and the Court's inherent power, and sanctions will be imposed against Lynn Smith.

### 2. Dunn

The SEC contends that Dunn knew or should have known of the existence of the Annuity Agreement prior to MDO I on July 7, 2010 because she was aware from the beginning of her involvement with the Trust that it was a "private annuity trust" created, at least in part, to reduce the tax consequences to the Smiths from their capital gains on the bank stock which funded the Trust. Therefore, Dunn knew that there must have been created an additional document such as the Annuity Agreement to complete the "private annuity trust." Such knowledge, then, rendered Dunn's elicitation of evidence and arguments to the contrary during the preliminary injunction proceedings fraudulent. Pl. Mem. of Law (Dkt. No. 261–1) at 5–7. The SEC further contends that Dunn also submitted a declaration during the proceedings on the SEC's motion for reconsideration which falsely asserted that Dunn did not learn of the existence of the Annuity Agreement until after her telephone conversation with the SEC on July 22, 2010. *Id.* at 11–14. Dunn denies both contentions. Dkt. Nos. 300–02.

As to the SEC's first contention, the record amply demonstrates that during the preliminary injunction proceedings, Dunn elicited evidence and made arguments in support of the Trust's position that the Trust had been created by the Smiths as "irrevocable" and the Smiths retained no interest of any kind in the Trust after its creation. The SEC's contention that these efforts by Dunn were deliberately fraudulent, however, depends on whether it can fairly be inferred that given Dunn's suspicion that another document must have been created to facilitate

describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets...."

the Smiths' tax-avoidance desires, Dunn knew or should have known of the existence of the Annuity Agreement as that other document.

The record does not support this inference. There is no indication that any of the three individuals with actual knowledge of the Annuity Agreement—David Smith, Lynn Smith, or Urbelis—ever shared that knowledge with Dunn or anyone else prior to July 7, 2010. Dunn may well have suspected before July 7, 2010 that other documents were necessary to complete a "private annuity trust," but the record fails to demonstrate that Dunn ever concluded, or even should have concluded, that the Annuity Agreement or a similar document existed. Thus, the SEC has failed to demonstrate by clear and convincing evidence that Dunn possessed the requisite knowledge of the existence of the Annuity Agreement prior to July 7, 2010 or that she acted in bad faith, either objectively or subjectively, prior to that date. The SEC's motion as to Dunn for conduct prior to July 7, 2010 is accordingly denied.

As to Dunn's declaration filed during the proceedings on the SEC's motion for reconsideration as to the Trust, the sequence of events becomes important. MDO I was filed on July 7, 2010 which lifted the asset freeze as to the Trust based on a finding that the SEC had failed to demonstrate that David Smith possessed any ongoing interest in the Trust. MDO I at 217–19. The Annuity Agreement, which demonstrated the requisite ongoing interest of David Smith, had not been disclosed to the SEC by that date. On July 20, 2010, for reasons unknown, David Smith telefaxed a copy of the Annuity Agreement and related documents to Wojeski and on July 21, 2010, Wojeski electronically mailed those same documents to Dunn. Dunn Decl. (Dkt. No. 188) at ¶ 3; Wojeski Decl. (Dkt. No. 191) at ¶ 3. On July 22, 2010, two SEC

attorneys spoke by telephone with Dunn during which she made a passing reference to a "private annuity agreement." MDO II at 222–23. This caused the SEC to recontact Urbelis, who, on July 27, 2010, provided his copy of the Annuity Agreement to the SEC and Dunn. *Id.* at 223.

The SEC then moved for reconsideration of MDO I as to the Trust on the ground of newly discovered evidence asserting that it had learned of the existence of the Annuity Agreement for the first time in the July 22, 2010 telephone conversation with Dunn. Dkt. No. 103; MDO II at 225–28. For the Trust, Dunn opposed the motion contending in part that she made no reference to a "private annuity trust" in the July 22, 2010 conversation with the SEC, she could not have done so because she did not learn of its existence until July 27, 2010 and she was unaware of it at the time of the telephone conversation. *Id.* Dunn also argues that the SEC's claim to the contrary was a pretext to account for its lack of due diligence in seeking disclosure of the Annuity Agreement prior to July 7, 2010, and the SEC's motion for reconsideration should thus be denied. *Id.* at 225–28. In support of the Trust's opposition, Dunn submitted a declaration on September 3, 2010 stating that the SEC's "assertion that I made a reference, passing or otherwise, to a 'private annuity agreement' in a telephone call on July 22, 2010 is simply and unequivocally false." Dunn Decl. (Dkt. No. 134) at ¶ 35. Dunn further asserted in her declaration that

> I can state with absolute certainty that I did not make that statement because *I did not know of the existence of the private annuity agreement until I received it from Thomas Urbelis on July 27, 2010*, the same day that the SEC received it. The Court should note also that, after receiving the annuity agree-

ment from Mr. Urbelis, Mr. Stoelting wrote to counsel of record and advised us that he had obtained the agreement from Mr. Urbelis and demanded that we produce other documents in our possession relating to the annuity. *Neither I nor Mr. Wojeski had any documents in our possession relating to the private annuity other than the courtesy copy of the documents I received from Mr. Urbelis on July 27 when Mr. Stoelting received them.*

... Quite simply, I received the document the same day that the SEC did. Despite my written statement to him that I did not have the private annuity agreement in my possession prior to July 27, Mr. Stoelting proceeded to file the instant motion several days later, and included a barrage of false assertions to lead this Court to believe that I and others concealed this document from the Court and the SEC. He did not provide the Court with my July 29 letter, and his misleading statements were clearly designed to seduce this Court into issuing a TRO freezing the Trust account and the accounts of Geoffrey and Lauren Smith before allowing counsel to be heard. While his efforts in that regard were initially successful, this type of deceitful conduct is sanctionable and he should not be rewarded with the grant[ing] of this motion for reconsideration.

...

... During the entire conversation, which probably lasted less than three minutes, I never used the phrase "private annuity agreement" even once, because *I didn't know a private annuity agreement existed until July 27.* ...

*Id.* at ¶ 36, 37, 45 (emphasis added).

Therefore, the determination of what was said by Dunn in the July 22, 2010 conversation with the SEC and when she

learned of the existence of the Annuity Agreement became material to a determination of the SEC's motion for reconsideration. Because that determination depended on an assessment of the credibility of the parties to the July 22, 2010 conversation, an evidentiary hearing to resolve the issue was scheduled for November 16, 2010. Dkt. Nos. 150, 156. On the evening of November 15, 2010, hours before the start of the evidentiary hearing at which she was to testify, Dunn filed another declaration in which she stated in part:

> In assisting with the Trust's response to Plaintiff's discovery demands, and in preparing for the evidentiary hearing scheduled for November 16, 2010, I became aware that on July 21, 2010, David Wojeski e-mailed to me the [Annuity Agreement]. I did not recall receiving or seeing the [Annuity Agreement] at the time I prepared the September Declaration, and my recollection has not been refreshed by seeing [the Annuity Agreement].

> My attention on July 20, 21, and 22, 2010, was focused heavily on the Trust's real estate closing which took place on July 22, 2010, and on other unrelated client matters and personal issues, including a death in the family. This might explain why I failed to remember the [Annuity Agreement] when I prepared my September Declaration.

Dunn Decl. (Dkt. No. 188) at ¶ 3–4. The evidentiary hearing was held, Dunn testified concerning the July 22, 2010 conversation, and MDO II was entered on November 22, 2010 rejecting Dunn's testimony concerning the July 22, 2010 conversation, granting the SEC's motion for reconsideration, and granting the preliminary injunction to freeze the assets of the Trust. MDO II. The Trust's motion for reconsideration of that order was denied on January 11, 2011. Dkt. No. 254 ("MDO III").

Dunn corrected the statements in her September 2010 declaration by filing the November 15, 2010 declaration. Therefore, Rule 11(c)(2) is inapplicable and sanctions may only be considered under the subjective bad faith standard of Rule 11(c)(3), section 1927, and the inherent power doctrine. It is beyond dispute that Dunn's assertions in her September 2010 declaration that she was unaware of the existence of the Annuity Agreement at the time of the conversation with the SEC on July 22, 2010 and that she did not learn of its existence until she received a copy of the agreement from Urbelis on July 27, 2010 were false. Dunn had in fact received a copy of the Annuity Agreement from Wojeski on July 21, 2010, the day prior to the conversation. Because the false statements by Dunn supported the Trust's contention that the SEC had manufactured the basis for its motion for reconsideration, those statements were also material to a determination of that motion. On the present motion, then, the question presented is whether the SEC has demonstrated by clear and convincing evidence that these false statements were made deliberately or, as Dunn contends, inadvertently.

 Dunn's explanation for the false statements in the September 2010 declaration is that she did not read the communication from Wojeski when she received it on July 21, 2010, she was distracted by a Trust-related real estate closing, other clients' business, and personal matters, and did not recall ever seeing the July 21, 2010 communication from Wojeski until shortly before November 15, 2010 when preparing for the November 16 evidentiary hearing. Dunn Decl. (Dkt. No. 188) at ¶¶ 3, 4. The claim that she did not review Wojeski's communication at least until after July 27, 2010 is belied by substantial evidence to the contrary.

First, it requires acceptance that Dunn did not read Wojeski's electronic mail for at least six days or, if she did, failed to grasp the significance of the communication. In this day and age, with electronic mail, smart phones, blackberries, and other methods of instant access to electronic communications, it is the rare, and probably less employed lawyer, who does not immediately receive and respond to clients' electronic communications. The claim that Dunn ignored Wojeski's communication of July 21, 2010 for six days defies credibility. The claim that if she did read it, she took no notice of the significance of the attached Annuity Agreement is even less credible. The central issue in MDO I was whether David Smith possessed any ongoing interest in the Trust. The conclusion in MDO I that he did not was the finding critical to denial of the SEC's motion to freeze the Trust's assets. The Annuity Agreement self-evidently constituted the proverbial "smoking gun" on this issue. *See* MDO III at 6. Dunn could not have read the Annuity Agreement and failed to note its significance to her client.

Second, the timing of Wojeski's communication discredits Dunn's claim. Wojeski sent the electronic mail to her on July 21, 2010. The telephone conversation between Dunn and the SEC attorneys occurred the next day. In that conversation Dunn made her first ever reference to a "private annuity agreement." MDO II at 225–28. The temporal proximity of the two events strongly suggests that Dunn's reference to "private annuity agreement" on July 22, 2010 resulted from her learning of the Annuity Agreement the previous day.

Third, Dunn possessed strong motive to deny learning of the Annuity Agreement on July 21, 2010. When the SEC obtained a copy of the Annuity Agreement from Urbelis on July 27, 2010, it moved for reconsideration of MDO I as to the Trust

and obtained a restraining order for the Trust's assets pending resolution of that motion. Dkt. Nos. 103, 104. The Trust's opposition to that motion contended in part that the SEC's assertion that its discovery of the Annuity Agreement on July 27, 2010 followed from Dunn's reference to a "private annuity agreement" in her July 22, 2010 telephone conversation with SEC attorneys was false and manufactured for purposes of its motion. *See* Dunn Decl. (Dkt. No. 134) at ¶¶ 36–45. In support of that contention, Dunn asserted that she could not have referred to a "private annuity agreement" in the July 22, 2010 conversation because she did not learn of the Annuity Agreement until five days later. *Id.*[16] Thus, Dunn's September 3, 2010 supporting declaration denying knowledge of the Annuity Agreement before July 27 was critical to this argument.

The stakes for the Trust and Dunn on that motion were substantial. The Trust then held over $4 million in assets. In the four weeks between MDO I on July 7 and the entry of a new restraining order on August 3, 2010, the Trust disbursed approximately $ 1 million to various recipients for purposes including living expenses and legal fees. *See* Dkt. No. 261–6 at 6. Approximately $101,000 was paid to Dunn. *Id.* Thus, the Trust's assets constituted a principal source of funds both for the Smith family and for the lawyers defending this action on their behalf, including Dunn. If the SEC prevailed on its motion for reconsideration, these funds would be lost, at least for a substantial period of time, to both the Smiths and to Dunn.

The record here thus demonstrates by clear and convincing evidence that Dunn's false statement in her declaration filed September 3, 2010 that she did not learn of

the Annuity Agreement until it was provided to her on July 27, 2010 by Urbelis was knowingly false. As with Wojeski's false assertion in his declaration to the same effect, Dunn's false statement, left uncorrected until the eve of the evidentiary hearing on November 16, 2011, unnecessarily extended and complicated preparations for that hearing. This suffices to meet the SEC's burden of demonstrating subjective bad faith under Rule 11(c)(3), § 1927, and the inherent power doctrine. Accordingly, the SEC's motion as to Dunn is granted as to the September 3 declaration.

### 3. Wojeski

The SEC contends that Wojeski knew of the existence of the Annuity Agreement prior to the July 7, 2010 decision in MDO I but falsely testified that the Trust was created solely for the benefit of the Smiths' children and that Wojeski falsely stated in an affidavit filed with the Court that he did not learn of the existence of the Annuity Agreement until late July 2010 when he was informed of it by Dunn after the SEC obtained a copy from Urbelis. Pl. Mem. of Law (Dkt. No. 261–1) at 7–9. Wojeski denies any knowledge of the Annuity Agreement prior to July 7, 2010 and contends that he acted in good faith at all times. Wojeski Aff. (Dkt. No. 306) at ¶ 21–27.

Wojeski is a Certified Public Accountant and the Managing Director of an accounting firm. Wojeski Aff. (Dkt. No. 306) at ¶ 2. In April 2010, he was contacted by Dunn to replace Urbelis as Trustee of the Trust and reviewed Trust documents before accepting the position. *Id.* at ¶ 3. Wojeski accepted the position effective May 22, 2010. *Id.* at ¶ 7. During the pre-

---

**16.** Dunn prepared the similarly false declaration filed by Wojeski on behalf of the Trust.

Wojeski Aff. (Dkt. No. 306) at ¶ 22.

liminary injunction proceedings, Wojeski testified in support of the Trust that it had been created by the Smiths for the sole benefit of their children and that the Smiths retained no interest of any kind in the Trust. T. 550–51; *see also* Wojeski Decl. (Dkt. No. 32) at ¶ 5 (the Smiths "have no interest, whether present, future or reversionary, in the trust, its income or its assets, as it is irrevocable by its own terms and pursuant to provisions of the New York Estates, Powers & Trusts Law."). Wojeski resigned as Trustee effective January 8, 2011 and his replacement as Trustee has been substituted as the named party in this action effective February 14, 2011. Wojeski Aff. (Dkt. No. 306) at ¶ 28; Dkt. No. 281.

The SEC first contends that Wojeski acted in concert with others to conceal the existence of the Annuity Agreement during the preliminary injunction proceedings. This contention rests on the fact that Wojeski reviewed all Trust documents when he became Trustee, including all transactions and tax returns. The SEC contends that from this review, Wojeski knew or should have known that the transfer of stock from the Smiths to the Trust which created the Trust was not a gift from the Smiths but a sale in return for the Annuity Agreement. Pl. Mem. of Law (Dkt. No. 261–1) at 7–8. The Smiths' transfer of stock to the Trust, however, even in combination with all other Trust documents, did not necessarily reveal or even suggest the existence of the Annuity Agreement. Both objectively and subjectively as to Wojeski, a review of those documents, which were produced at the evidentiary hearing, compels the conclusion only that the Smiths created the "irrevocable" trust with a donation of stock for which they received no consideration, then or in the future. Those documents did not reasonably suggest the existence of the Annuity Agreement to anyone, including Wojeski.

Accordingly, the SEC has failed to demonstrate that Wojeski deliberately took any action before MDO I on July 7, 2010 to conceal the existence of the Annuity Agreement or to mislead the SEC or the Court as to the Trust.

The SEC further contends that Wojeski filed a false affidavit as to when he learned of the existence of the Annuity Agreement. Wojeski now acknowledges that on July 20, 2010, David Smith telefaxed to Wojeski a copy of the Annuity Agreement and related documents. Wojeski Decl. (Dkt. No. 191) at ¶ 3. Wojeski forwarded the agreement to Dunn the next day by electronic mail. Dunn Decl. (Dkt. No. 188) at ¶ 3. However, on October 7, 2010, Wojeski filed a declaration asserting that

> [t]he first I learned of the existence of an annuity agreement was in late July, when my attorney informed me that the former trustee had just produced the agreement simultaneously to her and to the SEC's counsel.

Wojeski Decl. (Dkt. No. 147) at ¶ 2. This declaration was filed in opposition to the SEC's motion for reconsideration of MDO I as to the Trust. In its opposition, the Trust contended that the SEC had falsely claimed that it was alerted to the possible existence of the Annuity Agreement in a telephone conversation with Dunn on July 22, 2010 when she made a passing reference to such an agreement. MDO II at 222–23. Dunn denied knowing of the Annuity Agreement on that date or making such a reference and thereby contended that the SEC had manufactured the principal basis for its motion. Dunn Decl. (Dkt. No. 134) at ¶¶ 35–36. Wojeski's assertion thus served to corroborate Dunn's contention. Wojeski Decl. (Dkt. No. 147) at ¶ 21.

An evidentiary hearing was scheduled for November 16, 2010 to resolve the factual question whether Dunn had referred

to the Annuity Agreement in the July 22, 2010 conversation with the SEC. On the evening of November 15, 2010, Dunn filed a declaration acknowledging for the first time that she in fact had received a copy of the Annuity Agreement from Wojeski on July 21, 2010, the day before her conversation with the SEC. Dunn Decl. (Dkt. No. 188). The evidentiary hearing was held as scheduled on November 16, 2010. On November 17, 2010, Wojeski filed a declaration acknowledging receipt of a copy of the Annuity Agreement from David Smith on July 20, 2010 and explaining that

> [i]n gathering documents to assist with the Trust's response to Plaintiff's discovery demands, I produced a five-page document that David Smith faxed to me on July 20, 2010.... This document did not contain a signed contract or a copy of the "Private Annuity Agreement" that was apparently subsequently produced by Mr. Urbelis.

> On October 6, when I reviewed the Declaration drafted by my attorney, eleven (11) weeks had passed since the events at issue. At that time, I did not realize that the document ... was different from the document she received from Mr. Urbelis on July 27 and, in briefly reviewing the draft declaration, I thought that the two events had occurred at the same time.

Wojeski Decl. (Dkt. No. 191) at ¶¶ 3–4. In response to the present motion, Wojeski further states that

> [w]hen I signed the October Affidavit, I was stipulating to the fact that I learned of the existence of the annuity agreement in late July, which in my mind was referring to the July 20th date that I received the fax of the annuity illustration. I was not aware that this "late July" reference had a different meaning to Dunn, who drafted the affidavit on my behalf. Although I did not see any

problem with the October Affidavit at the time, in hindsight, I acknowledged that it would have been clearer had the exact date of July 20th been used. As such, upon advice of counsel, I submitted a clarifying affidavit, dated November 17, 2010 ("November Affidavit"), stating that "the first I learned of the possible existence of an annuity was in late July, when I received documents faxed to me by David Smith" to clarify my prior statement about when I first learned of the existence of the Annuity Agreement.

Wojeski Aff. (Dkt. No. 306) at ¶ 23.

Wojeski's attempt to explain the false statement in his October declaration fails. First, the conflation of July 20, 2010 when Wojeski learned of the existence of the Annuity Agreement from David Smith with July 27, 2010 when the SEC provided a copy to Dunn disingenuously ignores the central issue then pending as to the content of the conversation between Dunn and the SEC on July 22, 2010 and whether Dunn then knew of the existence of the agreement. Disclosure of the true dates would have undermined the credibility of Dunn's assertions that she was unaware of the agreement at the time of her conversation with the SEC. Second, Wojeski asserted in the October declaration that he learned of the agreement first not from David Smith but from Dunn and the SEC. Wojeski asserted that "[t]he first I learned of the existence of an annuity agreement was in late July, *when my attorney informed me that the former trustee had just produced the agreement simultaneously to her and to the SEC's counsel.*" Wojeski Decl. (Dkt. No. 147) at ¶ 2. (emphasis added). Wojeski in fact first learned of the agreement from David Smith, not from Urbelis, the SEC, or Dunn, and Wojeski then provided a copy to Dunn prior to Dunn's telephone conversation with the SEC. Thus, the record demonstrates by

clear and convincing evidence that Wojeski made a false statement as to a material fact in his October declaration and has exacerbated that conduct by falsely claiming that the reference in that affidavit to "late July" was at worst an imprecise reference to the David Smith telefax on July 20, 2010 when in fact it explicitly referred to the communication from Urbelis and the SEC to Dunn a week later.

Wojeski, a party at the time of the conduct in question here, corrected the false statement in the October declaration with his November 2010 declaration. Dkt. No. 191. Therefore, sanctions under Rule 11(c)(2) cannot be considered. However, sanctions under Rule 11(c)(3) and the inherent power doctrine may still be considered if the SEC has demonstrated by clear and convincing evidence that Wojeski acted in subjective bad faith. Such sanctions ought to be considered here because Wojeski's false statement was submitted in connection with a central issue on the SEC's motion for reconsideration—that is, whether Dunn had knowledge of the existence of the Annuity Agreement at the time of her telephone conversation with the SEC on July 22, 2011. The declaration not only undermined the truth-seeking process but unnecessarily complicated preparations for the evidentiary hearing concerning the Dunn–SEC telephone conversation.

In addition to the patent falsity of Wojeski's assertion, his subsequent explanation that he was only imprecise, not dishonest, is belied by the reference in the October 2010 declaration that he learned of the agreement first when it came to him by way of Urbelis, the SEC, and Dunn. Wojeski's statement was not simply imprecise but intentionally misleading as was the

explanation. On this record, therefore, the SEC has demonstrated by clear and convincing evidence that Wojeski filed the October declaration containing a knowingly false statement in support of the Trust's contention that the SEC had manufactured a false basis for its motion for reconsideration. Wojeski's deliberate conduct here suffices to constitute subjective bad faith and the SEC's motion for sanctions for that conduct is granted under Rule 11(c)(3) and the inherent power doctrine.

#### 4. Urbelis

Urbelis, an attorney admitted to practice in Massachusetts and New York, was a lifelong friend of David and Lynn Smith. Urbelis Aff. (Dkt. No. 309) at ¶¶ 1, 4. In August 2004, he accepted David Smith's request that he serve as Trustee of the Trust without compensation. Id. at ¶¶ 6, 13. For reasons discussed below, Urbelis resigned as Trustee on April 22, 2010 effective May 27, 2010. Id. at ¶ 15. In August 2004, Urbelis signed the Annuity Agreement on behalf of the Trust and received a copy of the agreement. Id. at ¶ 10.[17] In proceedings leading to the hearing on the SEC's motion for a preliminary injunction, Urbelis produced to the SEC documents of the Trust and appeared for a deposition on June 1, 2010. See MDO II at 224–25; Urbelis Aff. at ¶¶ 19–32. Urbelis failed to disclose the Annuity Agreement either in the documents he provided or at his deposition. MDO II at 224–25. On Friday, July 23, 2010, the day following Dunn's conversation with the SEC, the SEC telephoned Urbelis and inquired specifically about the Annuity Agreement. Urbelis Aff. at ¶ 40. Urbelis agreed to search his records again for the agreement over the weekend. Id. Urbelis located his

---

**17.** The only copies of the Annuity Agreement in the record of this case bear the signatures only of David and Lynn Smith. The parties have stipulated, however, that Urbelis signed the agreement on behalf of the Trust and that the agreement is binding. See MDO II at 225 n. 10.

copy of the Annuity Agreement among papers at his residence and forwarded a copy of the agreement by overnight mail to counsel for the SEC, the Trust, and Lynn Smith. *Id.* at ¶¶ 41, 42.

■ The SEC contends that Urbelis' failure to disclose the existence of the Annuity Agreement prior to July 7, 2010 despite its requests constituted subjective bad faith for which sanctions should be imposed. Pl. Mem. of Law (Dkt. No. 261–1) at 4–5. In the circumstances presented here, however, the SEC has failed to meet its burden of proof as to Urbelis. First, Urbelis lacked any interest in common with the Trust or the Smiths and in fact his financial interests were at odds with those of the trust and the Smiths. Urbelis received no compensation as Trustee. Urbelis Aff. at ¶ 13. He also invested funds with David Smith in David Smith's various ventures on behalf of Urbelis as well as his family members. *Id.* at ¶ 5. In late 2009, Urbelis learned that the value of those investments had declined "precipitously." *Id.* at ¶ 14. When Urbelis learned of the filing of this action on April 21, 2010, it became apparent that Urbelis' investments with David Smith were all at risk, there now existed a conflict between he and David Smith which affected his ability to continue as Trustee, and he resigned as trustee the following day. *Id.* at ¶ 15. Thus, unlike others, Urbelis lacked any financial incentive to conceal the Annuity

Agreement and in fact as an investor in David Smith's ventures, possessed an interest in common with the SEC, and adverse to David Smith and the Trust, to recover assets of David Smith for the possible reimbursement of such investors.

Second, the circumstances of Urbelis' document production and deposition belie bad faith. Urbelis was contacted in Boston by the SEC for the first time by telephone on Friday, May 28, 2010. Urbelis Aff. at ¶ 19. In connection with the preliminary injunction proceedings, the SEC asked him to appear for a deposition in Albany, a distance of approximately 150 miles, on the next business day, June 1, 2010. *Id.* at ¶ 20. Although not compelled to do so, Urbelis voluntarily agreed and further agreed to provide to the SEC the same documents he had previously provided to the Trust's attorney but cautioned that he did not have time to search for additional Trust documents. *Id.* at ¶¶ 20, 21, 23. Moments later, the SEC sent a subpoena duces tecum to Urbelis purporting to require his appearance at the deposition for which he had just agreed to appear and requiring production of a broader range of documents than he had agreed to produce. *Id.* at ¶ 22.[18] Urbelis produced to the SEC the documents he had previously produced to the Trust's attorney and appeared in Albany at his own expense without counsel[19] for the de-

---

**18.** As Urbelis recognized, the subpoena was unenforceable because it was issued from the Northern District of New York rather than the District of Massachusetts (Dkt. No. 309–1 at 16), the method of service was defective, and the appearance date for testimony and production of documents was unreasonably short. *See* Fed.R.Civ.P. 45(b)(2) (service), (c)(3)(A)(i) (response time), (c)(3)(A)(ii) (district). Thus, Urbelis' appearance at the deposition and his production of Trust documents was voluntary, not compelled.

**19.** The transcript of Urbelis' deposition states that he was represented by Dunn, the Trust's attorney. Dkt. No. 46–6 at 2. By then, Urbelis had resigned as Trustee and following receipt of the transcript of his deposition, submitted an errata sheet to the stenographer which, *inter alia,* noted that he was *not* represented by Dunn at the deposition. Dunn Decl. (Dkt. No. 214–1) at ¶¶ 7–12, 16–19, & Ex. E (Dkt. No. 214–2 at 14–20); Urbelis Aff. at ¶ 31. Urbelis' errata sheet was never made a part of the record before MDO II, however. MDO III at 3. This factual error was addressed on

position on June 1, 2010. *Id.* at ¶¶ 26, 27. As he had done with the SEC's request that he travel to Albany for the deposition, Urbelis again traveled to Albany on June 10, 2010 at the request of the Trust's attorney at his own expense to testify at the evidentiary hearing. *Id.* at ¶ 32. The Trust determined not to call him as a witness, however, and he returned to Boston. *Id.* Such conduct is inconsistent with subjective bad faith.

Finally, Urbelis' response to the SEC when he was contacted on July 23, 2010 also belies any bad faith. When the SEC telephoned him on that date and asked him to search specifically for a "private annuity agreement," Urbelis did so. Urbelis Aff. at ¶¶ 40, 41. Urbelis had maintained Trust-related documents at his law office during his term as Trustee and had provided copies of those documents to the Trust and the SEC in May 2010. *Id.* at ¶ 8. The Annuity Agreement was not among those documents produced. *Id.* at ¶¶ 10, 11. In response to the SEC's July 23 request, Urbelis searched his home in addition to his law office and found a copy of the Annuity Agreement among loose papers in his home. *Id.* at ¶¶ 40, 41. He sent copies of the agreement the next business day to the SEC, counsel for the Trust, and counsel for Lynn Smith. *Id.* at ¶ 42, 44. In these circumstances, Urbelis' conduct constituted mere negligence at worst in misplacing the Annuity Agreement but in all other respects appears not only unimpeachable but self-sacrificing and responsible.

Thus, the SEC has failed to demonstrate that Urbelis acted with anything approaching subjective bad faith in his initial failure to produce or in his subsequent production of the Annuity Agreement. The SEC's motion as to Urbelis is denied.

the Trust's motion for reconsideration of

### 5. Featherstonhaugh

Finally, while acknowledging that insufficient evidence exists to find that Featherstonhaugh took any action to conceal the existence of the Annuity Agreement, the SEC seeks an evidentiary hearing to discover whether such evidence exists and a determination on this motion that the crime-fraud exception permits the SEC to compel the testimony of Featherstonhaugh's clients, including Lynn Smith, as to their communications with Featherstonhaugh concerning the Annuity Agreement. Pl. Mem. of Law (Dkt. No. 261-1) at 21–23. The SEC contends that the hearing should be ordered because based on Featherstonhaugh's association with and representation of those who concealed the Annuity Agreement and his receipt of approximately $115,000 in legal fees after MDO I, sufficient "red flags" have been raised to merit further inquiry into Featherstonhaugh's involvement in the concealment. *Id.* at 208–10.

While the course of events regarding the Annuity Agreement may provide cause for the SEC to suspect Featherstonhaugh's involvement in the concealment, suspicions alone do not suffice to demonstrate subjective bad faith by clear and convincing evidence. They also provide no sufficient basis for exploring the level of Featherstonhaugh's knowledge at any point in time. Crediting the evidence which exists and drawing all reasonable inferences in favor of the SEC's contention, there exists insufficient evidence to conclude that Featherstonhaugh knew or participated in the concealment of the Annuity Agreement. Further, no material questions of fact as to Featherstonhaugh have been presented warranting an evidentiary hearing to discover whether Featherstonhaugh may have acted improperly. Thus, such relief cannot be justified on this record.

MDO II. *See* MDO III at 2–4.

The SEC's motion as to Featherstonhaugh is denied in all respects.

### C. Sanctions

#### 1. Legal Standard

■ Having determined that Lynn Smith, Dunn, and Wojeski acted with subjective bad faith as described above, the appropriate sanctions must be determined. The SEC seeks an order awarding attorneys' fees and costs jointly and severally as well as disgorgement of funds received from the Trust after MDO I. Pl. Mem. of Law (Dkt. No. 261–1) at 19–21. The imposition of sanctions serves to deter the objectionable conduct, compensate an offended party for costs incurred as a result of that conduct, and return matters to the conditions which existed prior to the offending conduct. *See Chambers,* 501 U.S. at 43, 111 S.Ct. 2123; *Vasile v. Dean Witter Reynolds Inc.,* 20 F.Supp.2d 465, 506 (E.D.N.Y.1998) (need to deter sanctionable conduct).

■ A court has "broad discretion to tailor appropriate and reasonable sanctions...." *Lawrence v. Wilder Richman Sec. Corp.,* 417 Fed.Appx. 11, 15 (2d Cir. 2010) (internal quotation marks omitted) (citing *O'Malley v. N.Y.C. Transit Auth.,* 896 F.2d 704, 709 (2d Cir.1990)); *Edmonds v. Seavey,* No. 08 Civ. 5646(HB), 2009 WL 4404815, at *4 (S.D.N.Y. Dec. 2, 2009) (gathering cases). Those sanctions most commonly include an award of attorneys' fees and costs. *Eastway Constr. Corp. v. City of N.Y.,* 821 F.2d 121, 123 (2d Cir. 1987); *Forbes v. NAMS Int'l, Inc.,* No. 3:07–CV–0039 (TJM/DEP), 2007 WL 1814656, at *5–6 (N.D.N.Y. June 21, 2007). However, such an award for sanctions is not bound by the lodestar amount. *See Eastway Constr. Corp.,* 821 F.2d at 122 (holding that attorneys' fee awarded as Rule 11 sanction can vary from lodestar amount, yet must still be within a range

reasonable to achieve deterrent objective of such award). Thus, in making such an award, a court must begin "with the lodestar or 'presumptively reasonable fee,' which is then adjusted as necessary to assure [the] deterrent objective is achieved." *Robbins & Myers, Inc. v. J.M. Huber Corp.,* No. 01–CV–00210(S)(F), 2010 WL 3992215, at *5 (W.D.N.Y. Oct. 12, 2010). In particular circumstances, a public reprimand or admonishment may suffice. *See, e.g., In re Rezulin Prods. Liab. Litig.* (MDL No. 1348), No. 00 CIV. 2843 LAK, 2005 WL 626866, at *2 (S.D.N.Y. Mar. 17, 2005) (issuing formal reprimand as sanction); *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 02 Civ.2561(KMW)(GWG), 2003 WL 22227956, at *14 (S.D.N.Y. Sept. 26, 2003) (imposing formal admonishment a sanction).

■ Disgorgement may also be ordered where necessary to restore an aggrieved party to the position that party would have enjoyed but for the offending conduct. *See S.E.C. v. China Energy Sav. Tech., Inc.,* No. 06–CV–6402 (ADS)(AKT), 2008 WL 6572372, at *10 (E.D.N.Y. Mar. 28, 2008). "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474–75 (2d Cir.1996); *see also S.E.C. v. Posner,* 16 F.3d 520, 522 (2d Cir.1994) (holding that "[t]he [district] court has broad discretion to tailor the sanction to the wrongful conduct involved"); *S.E.C. v. Robinson,* No. 00 Civ. 7452, 2002 WL 1552049, at *7 (S.D.N.Y. July 16, 2002). The disgorged amount must be " 'causally connected to the violation,' " but it need not be figured with exactitude. *First Jersey Sec., Inc.,* 101 F.3d at 1475 (internal quotation marks and citation omitted); *Robinson,* 2002 WL

1552049, at *7; *S.E.C. v. McCaskey*, No. 98 Civ. 6153, 2002 WL 850001, at *4 (S.D.N.Y. Mar. 26, 2002).

## 2. Lynn Smith

As a direct and proximate result of Lynn Smith's concealment of the Annuity Agreement, the assets of the Trust were released from the asset freeze. *See* MDO I at 219 (releasing the Trust from the asset freeze because "there is no likelihood that the SEC will prove that David Smith was the beneficial owner of the Trust."); MDO II at 232–33 (granting reconsideration and re-freezing the Trust);[20] MDO III at 6.[21] As a natural and probable consequence of Lynn Smith's concealment, the SEC was adversely affected in at least two ways.

■■■ First, in the four weeks between the release of the Trust's assets from the freeze in MDO I on July 7 and the entry of the order re-freezing those assets on August 3, 2010 (Dkt. No. 104), the Trust was depleted of a total of $944,848.00. Trust Accounting (Dkt. No. 142–2) at 4; Dunn e-mail (Dkt. No. 261–6) at 8. Of that amount, $600,000.00 plus closing costs was distributed to Lynn Smith for the sale of the Great Sacandaga Lake property[22] to the Trust, $101,096.00 was disbursed to Dunn as attorney's fees and costs, and $8,098.50 as fees to Wojeski. Trust Accounting at 4. But for Lynn Smith's concealment of the Annuity Agreement, none of these disbursements could or would have occurred. Thus, the harm to the Trust and the SEC resulting from Lynn Smith's conduct is the total amount disbursed by the Trust of $944,848.00 and Lynn Smith shall be required to disgorge this amount to the Receiver on behalf of the Trust. If Lynn Smith fails to pay this amount to the Receiver by **September 1, 2011,** the Receiver may have judgment against Lynn Smith for any amount which remains unpaid.

As to the Great Sacandaga Lake property, it appears that the Trust has taken title to that property from Lynn Smith in the sale which occurred in July 2010. Therefore, if Lynn Smith fails to return to the Receiver by September 1, 2011 the full amount of the $600,000.00 sale price of the property plus closing costs, the Receiver may proceed in whatever manner he deems economically most feasible to maximize the return on this property. This may include the sale or rental of the property, or portions thereof, depending on the

20.
When the Annuity Agreement is added to the analysis, ... the conclusion is compelled that David Smith possessed an equitable and beneficial interest in the Trust through the Annuity Agreement and that his conduct in controlling the investments of Trust assets by the Trustee, paying the Trust's taxes, and, with his wife, paying the living expenses of his adult child was to protect the assets of the Trust to insure their existence when the Annuity Agreement payments were to commence and not simply to protect those assets for the use of his children.
MDO II at 232–33.

21.
Contrary to the contention of the Trust that the Court was clearly erroneous in according significant weight to the Annuity Agreement, the discovery of that agreement was critical to the disposition of the SEC's motion to freeze the Trust's assets. Indeed, on the issue of the Smiths' interest in the Trust, the Annuity Agreement constituted the proverbial "smoking gun." The Trust's recognition of this truth is demonstrated by the lengths to which those associated with them and the Trust went to conceal the existence of the Annuity Agreement in the face of legal, ethical, and professional obligations to the contrary.
MDO III at 6.

22. *See* MDO I at 201–02, 217 (describing property and denying SEC motion for a preliminary injunction as to that property).

receiver's determination of market conditions. Lynn Smith and the Trust shall cooperate reasonably with the Receiver and any designee to facilitate the sale or rental of the property.

■ Second, Lynn Smith's concealment of the Annuity Agreement required the SEC to incur the cost and expense of litigating its motion for reconsideration (Dkt. No. 103). The reimbursement of such costs are appropriate in these circumstances as they too proximately resulted from Lynn Smith's deliberate concealment.

■ As to amount, the SEC seeks a total award of $164,000.00. Mehraban Decl. (Dkt. No. 261–2) at ¶¶ 3–13. This total results from the SEC's lodestar calculation of estimated hours expended multiplied by the hourly rate of the attorneys plus the cost of an expert witness. *Id.* For various reasons, this lodestar calculation must be substantially reduced. First, the hourly rate in a lodestar calculation requires a determination of what amount a reasonable client would pay for services of the type at issue in the geographic area in question. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 190–92 (2d Cir.2008). This requires a court to approximate "the market rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998) (internal quotation marks and citations omitted). This determination should be based on rates from prior cases in the judicial district, attorney affidavits, and the court's own experience with billing rates. *See Farbotko v. Clinton County of New York,* 433 F.3d 204, 209 (2d Cir.2005). For purposes of this analysis, the SEC does not dispute that the Northern District, where the case is pending, rather than the Southern District of New York, where the SEC's attorneys are lo-

cated, provides the relevant geographic area for this determination. *See* Mehraban Decl.(Dkt. No. 261–2) at ¶¶ 3 (basing hourly rate sought on the rates charged by an Albany law firm), 12 (". . . the case law regarding attorneys' fees suggests a billing rate for a local attorney . . . ."). "The hourly rate properly charged for the time of a government attorney is the 'amount to which attorneys of like skill in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation.'" *United States v. Kirksey,* 639 F.Supp. 634, 637 (S.D.N.Y.1986); *see also Adams v. New York State Educ. Dep't,* 630 F.Supp.2d 333, 348 (S.D.N.Y. 2009) (quoting *Kirksey* ); *N.L.R.B. v. A.G.F. Sports Ltd.,* No. MISC. 93–049(CBA), 1994 WL 507779, at *1 (E.D.N.Y. June 22, 1994) (same).

Prior reported cases from this district appear to have allowed a maximum hourly rate for the most experienced attorneys of up to $275. *See, e.g., Van Echaute v. Law Office of Thomas Landis, Esq.,* No. 6:09–CV–1071 (NAM/GHL), 2011 WL 1302195, at *4 (N.D.N.Y. Mar. 31, 2011) (Mordue, C.J.) (allowing $210 for experienced consumer protection attorney); *Engineers Joint Welfare Fund v. Western N.Y. Contractors, Inc.,* No. 5:09–CV–0417 (GTS/DEP), 2010 WL 2682224, at *4 (N.D.N.Y. July 2, 2010) (Suddaby, J.) (allowing $210 rate for experienced attorney in employee benefits action); *Martinez v. Thompson,* No. 9:04–CV–0440 (DEP), 2008 WL 5157395, at *16–17 (N.D.N.Y. Dec. 8, 2008) (Peebles, M.J.) (allowing $275 rate for two attorneys in prisoner civil rights action); *Lewis v. City of Albany,* 554 F.Supp.2d 297, 300 (N.D.N.Y.2008) ($210 in civil rights case); *Picinich v. UPS,* No. 5:01–CV–01868 (NPM), 2008 WL 1766746, at *4 (N.D.N.Y. Apr. 14, 2008) (McCurn, J.) (allowing rate of $210 in employment discrimination case).

According to the SEC's application, four attorneys participated in the investigation, preparation, and litigation of its motion for reconsideration. Mehraban Decl. (Dkt. No. 261–2) at ¶¶ 4–8. A review of their credentials and from the court's observation of their appearances in court and their written submissions, each falls within the descriptions provided by the SEC. Thus, the Court finds that David Stoelting, Kevin McGrath, and Jack Kaufman qualify as experienced litigators in the area of securities fraud equivalent to a partner in a law firm in the private sector of this area. Lara Mehraban's background and experience are equivalent to those of senior associates or junior partners in such law firms. The hourly rates sought by the SEC, however, are based in large part on those charged by the law firm retained by the Trust to represent it and Dunn at the November 16, 2010 evidentiary hearing. *Id.* at ¶¶ 3–7. Those rates were $500 for a senior partner at an Albany law firm and $325 for a junior partner/senior associate. Dkt. No. 229–1 at 12.

■ The information on the rates charged by a single law firm is, however, insufficient to determine the appropriate hourly rate for public sector attorneys paid on a salary basis rather than an hourly rate. The SEC provides no information on the actual salaries paid to the attorneys in question or a calculation of what portion of those salaries was devoted to the litigation of the motion for reconsideration. It is instructive here, however, that the SEC retained a Receiver to amass and manage for the potential benefit of defendants' investors the various assets of the defendants. The Receiver retained by the SEC is a senior partner at a Buffalo law firm with offices in Albany who normally charges an hourly rate of $425. Receiver's First Application for Compensation (Dkt. No. 201–1) at ¶ 3. The Receiver is also experienced, well credentialed, and, from the Court's personal observations in this case, extremely able. The SEC negotiated an hourly rate for the receiver of $225. *Id.* As to the prevailing hourly rate for services comparable to those performed here by the SEC attorneys, the Court finds this evidence highly persuasive.

■ Given the limited evidence provided by the SEC on the hourly rates charged in the Northern District for similar work, the hourly rate negotiated by the SEC with the receiver for work in a related and complex area of law for an attorney of similar competence and ability, and the Court's knowledge of prevailing market rates for attorneys in this district, the Court finds that an hourly rate of $225 is appropriate for Stoelting, McGrath, and Kaufman and a rate of $190 is appropriate for Mehraban.

As to the number of hours, the SEC asserts that Stoelting, McGrath, and Kaufman spent a total of 192 hours on matters related to the motion for reconsideration after July 7, 2010 and that Mehraban spent a total of 176 hours. Mehraban Decl. (Dkt. No. 261–2) at ¶¶ 8, 9. These hours are not supported by contemporaneous time records because SEC attorneys do not maintain such records. *Id.* at ¶ 8. Rather, the hours claimed are supported by the SEC's estimate of the hours and the types of work to which those hours were devoted. *Id.* While contemporaneous time records are ordinarily required for an award of attorney's fees, alternative methods of calculating such fees may be utilized where such records are not ordinarily maintained. *See Orantes–Hernandez v. Holder,* 713 F.Supp.2d 929, 966 (C.D.Cal. 2010) (reducing hours claimed by 25% where attorneys had misplaced contemporaneous time records); *Habitat Educ. Ctr., Inc. v. Bosworth,* Nos. 03C1023, 03C1024, 04C0254, 2006 WL 839166, at *6 (E.D.Wis.

Mar. 29, 2006) (holding that reconstructed time records may suffice for an award of attorney's fees in the absence of contemporaneous billing records if supported by other evidence); *United States v. Romelien*, No. 05–CV–1341 DRH/JO, 2006 WL 721312, at *2–3 (E.D.N.Y. Mar. 16, 2006) (awarding a percentage of the amount recovered by an attorney in a collection action). The SEC's estimates of time expended here appear both reasonable and conservative and will be credited.

In at least two respects, however, the hours claimed appear overstated and, therefore, unreasonable. First, while four attorneys may have expended time on the issues raised by the Annuity Agreement,[23] it appears that the services of no more than two attorneys were reasonably required to accomplish the tasks described by the SEC. The issues were narrow, particularly after discovery of the Annuity Agreement on July 27, 2010, and the factual and legal issues for the hearing on November 16, 2010 were not complex. From the observations of the Court and the SEC's submission, it appears that Stoelting and Mehraban performed the majority of the work in that time period. *See id.* at ¶ 8. Accordingly, only the hours they expended will be considered here.

Second, not all of the hours claimed by the SEC were strictly related to issues surrounding the motion for reconsideration. For example, the SEC seeks compensation for time expended in drafting, reviewing and filing its amended complaint. Mehraban Decl. (Dkt. No. 261–1) at ¶ 8. That effort was not limited to discovery of the Annuity Agreement as other, unrelated amendments were included as well. Moreover, time spent reviewing documents made available by the United States Attorney's Office ("USAO") would have been required regardless of when the Annuity Agreement was discovered. Therefore, the hours claimed by Stoelting and Mehraban will be reduced by 20% each to account for such time not reasonably related to proceedings necessitated by concealment of the Annuity Agreement.

Reducing Stoelting's claimed seventy-six hours by 20% leaves a total of 60.8 hours at an hourly rate of $225 for a total of $13,680.00. Reducing Mehraban's claimed 176 hours by 20% leaves a total of 140.8 hours at an hourly rate of $190 for a total of $26,752.00. Therefore, a total of $40,432.00 will be awarded to the SEC against Lynn Smith for attorneys' fees.

■■■ The SEC also seeks an award of $10,800 for fees paid to a tax law expert in connection with the Annuity Agreement. Mehraban Decl. (Dkt. No. 261–2) at ¶ 11. While not challenging the reasonableness of the amount paid to the expert, Lynn Smith contends that this expenditure should be denied as unnecessary. L. Smith Mem. of Law (Dkt. No. 303) at 20–21. However, tax issues underlay the Smiths determination to create the Trust and enter into the Annuity Agreement, those issues were obscure and complex, the trust itself retained a tax and estates law expert in the same period, and the SEC's determination to incur this cost was, therefore, both reasonable and necessitated by Lynn Smith's concealment of the Annuity Agreement. Accordingly, this cost will also be allowed.

### 3. Dunn and Wojeski

■■■ The SEC seeks and award of fees and costs against Dunn and Wojeski as well as that the awards of fees and costs

---

**23.** According to the SEC, more than four attorneys were involved in matters related to the Annuity Agreement after July 7, 2010, but it seeks an award only for the time of the four attorneys identified above. Mehraban Decl. (Dkt. No. 261–2) at ¶ 10.

be made jointly and severally. Pl. Mem. of Law (Dkt. No. 261–1) at 19. However, monetary sanctions awarded to compensate an aggrieved party for costs incurred as a result of the misconduct of another party or attorney must reasonably have resulted from such misconduct. *See Chambers*, 501 U.S. at 43 n. 8, 111 S.Ct. 2123; *Vasile*, 20 F.Supp.2d at 506. Here, there exists insufficient evidence to conclude that either Dunn or Wojeski had knowledge of the existence of the Annuity Agreement prior to MDO I on July 7, 2011 and, therefore, committed no sanctionable conduct prior to the release of the Trust's assets from the restraining order. They therefore cannot be held responsible for any disbursements from the Trust before July 20, 2010. As discussed, however, the conduct of Dunn and Wojeski after July 20 and 21, 2010 when they received notice of the existence of the Annuity Agreement is sanctionable.

■ Dunn received two disbursements from the Trust after July 7, 2010. On July 9, 2010, she received $95,741.40. Dkt. No. 261–6 at 6. On July 31, 2010, she received $5,355.00. *Id.* The first payment was received before Dunn had knowledge of the existence of the Annuity Agreement and, therefore, no basis exists to order its disgorgement. The second, however, was received after Dunn became aware of the existence of the Annuity Agreement and this wrongful depletion of the Trust's assets thus occurred with Dunn's complicity. Accordingly, Dunn shall disgorge $5,355.00 to the Receiver on behalf of the Trust jointly and severally with Lynn Smith.

Wojeski also received two disbursements from the Trust after July 7, 2010. Both were made on July 26, 2010, one for $8,098.50 and the second for $5,775.50. Dkt. No. 261–6 at 6. Both disbursements were thus received by Wojeski after he learned of the existence of the Annuity Agreement and this wrongful depletion of the Trust's assets thus occurred with Wojeski's complicity. Accordingly, Wojeski shall disgorge $13,834.00 to the Receiver on behalf of the Trust jointly and severally with Lynn Smith.

Wojeski learned of the existence of the Annuity Agreement on July 20, 2010 and Dunn the following day. They did not share this discovery with the SEC, but the SEC nevertheless discovered its existence on July 27, 2010 from Urbelis. The delay of less than one week, including a weekend, in disclosure of the agreement to the SEC could only marginally have increased the time expended by the SEC on this issue. Dunn opposed the SEC's motion for reconsideration on behalf of the Trust, but her arguments, while intemperate and ultimately unsuccessful, were colorably based on facts and law with the exceptions noted below. The mere fact that she and the Trust opposed the SEC's motion rather than conceding it did not constitute bad faith and did not increase the unnecessary costs to the SEC.

The question thus becomes the appropriate sanction, if any, for the submission by Dunn and Wojeski of the declarations falsely stating when they first learned of the existence of the Annuity Agreement. Those false declarations did not cause any disbursements from the Trust nor is there any evidence that they caused the SEC to expend any additional time or resources to prepare for the November 16, 2010 evidentiary hearing. There thus exists no basis for requiring either Dunn or Wojeski to pay attorneys' fees and costs to the SEC whether joint and several or apportioned.

There remains the fact, however, that Dunn and Wojeski both knowingly filed declarations containing false statements in support of the Trust's opposition to the SEC's motion for reconsideration. The bad faith with which Dunn and Wojeski

acted in filing these false declarations was mitigated only minimally by their last minute filings of corrective declarations. The deliberate filing of knowingly false declarations by an attorney and an accountant serving in a fiduciary position, if condoned, undermines any system of justice which relies on its participants to assert what they in good faith believe to be true, not merely to ignore or misstate inconvenient facts to obtain a desired result. Tolerance of such conduct undermines confidence in the outcome of judicial proceedings as well as in the professions of those involved. Therefore, the false declarations of Dunn and Wojeski, even in the absence of demonstrable harm to the SEC, warrant sanctions.

As to the appropriate sanction, no basis appears for awarding attorneys' fees or costs against either Dunn or Wojeski where no connection between their misconduct and harm to the SEC has been demonstrated. As to any punitive fine, it is noted that both Dunn and Wojeski have already suffered financially through the loss of their positions with the Trust and the need to retain attorneys separately to represent them in these proceedings. What remains available and appears most appropriate to the conduct and consequences here is, therefore, a public admonishment. *See In re Rezulin Prods. Liab. Litig.* (MDL No. 1348), 2005 WL 626866, at *2 (issuing formal reprimand as sanction); *Dangerfield,* 2003 WL 22227956, at *14 (imposing formal admonishment a sanction). Accordingly, Dunn and Wojeski are formally admonished for deliberately filing false declarations. As to Dunn, the Clerk shall forward a copy of this decision to the Committee on Professional Standards for the Third Department. As to Wojeski, the Clerk shall forward a copy of this decision to the New York State Department of Education, which oversees the licensing of certified public accountants.

## III. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that the SEC's motion for sanctions (Dkt. No. 261) is:

1. **GRANTED** as to Lynn Smith in all respects and

A. On or before **September 1, 2011,** Lynn Smith shall disgorge to the Receiver on behalf of the Trust a total of *$944,848.00* jointly and severally with Dunn and Wojeski to the extent indicated below and shall pay to the SEC a total of *$51,232.00* for attorneys' fees and costs incurred by the SEC; and

B. If Lynn Smith fails to disgorge and pay such amounts on or before **September 1, 2011:**

i. The SEC may have judgment against Lynn Smith for any amount which remains unpaid; and

ii. The Receiver is granted leave on behalf of the Trust to take whatever action he deems in his judgment to be financially appropriate to obtain the maximum possible return on the Great Sacandaga Lake property, including the sale or rental of that property, in whole or in part, in which case Lynn Smith will be entitled to offset any amount recovered by the Receiver for the property, less costs, against the total amount owed;

2. **GRANTED** as to Dunn to the extent that:

A. On or before **September 1, 2010,** Dunn shall disgorge to the Receiver on behalf of the Trust a total of *$5,355.00* jointly and severally with Lynn Smith and, if such amount is not disgorged by that

date, the SEC may have judgment against Dunn for any amount which remains unpaid;

B. She is publicly admonished for deliberately filing a false declaration;[24] and

C. The motion is otherwise **DENIED;**

3. **GRANTED** as to Wojeski to the extent that:

A. On or before **September 1, 2010,** Wojeski shall disgorge to the Receiver on behalf of the Trust a total of *$13,834.00* jointly and severally with Lynn Smith and, if such amount is not disgorged by that date, the SEC may have judgment against Wojeski for any amount which remains unpaid;

B. He is publicly admonished for deliberately filing a false declaration;[25] and

C. The motion is otherwise **DENIED;**

4. **DENIED** in all respects as to Urbelis; and

5. **DENIED** in all respects as to Featherstonhaugh.

**IT IS SO ORDERED.**

---

**24.** The Clerk shall forward a copy of this decision to the New York State Committee on Professional Standards for the Appellate Division, Third Department.

**25.** The Clerk shall forward a copy of this decision to the New York State Department of Education.